UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
KEIRA TALLEY,

        Plaintiff,

    -against-

BRENTWOOD UNION FREE SCHOOL DISTRICT;
BRENTWOOD BOARD OF EDUCATION;
GALE KIRKHAM, *in her individual capacity and
as a member of the Board of Education for the
Brentwood School District*; TOMAS DEL RIO,
*in his individual capacity and as a member of the
Board of Education for the Brentwood School
District*; JOSEPH FRITZ, *in his individual
capacity and as a member of the Board of Education
for the Brentwood School District*; and RESIDENTS
FOR BETTER SCHOOLS OF BRENTWOOD AND
NORTH BAY SHORE, NEW YORK, INC., *a
Not-for-Profit Organization*,

        Defendants.

-----------------------------------------------------X

**MEMORANDUM & ORDER
08 CV 790 (DRH)(ETB)**

**APPEARANCES:**

**Ilana L. Deutsch, Esq.**
Attorney for Plaintiff
353 Veterans Memorial Highway, Suite 210
Commack, New York 11725

**Sokoloff Stern LLP**
Attorneys for Defendants Gale Kirkham, Tomas Del Rio, and Joseph Fritz
355 Post Avenue, Suite 201
Westbury, New York 11590
By:    Adam I. Kleinberg, Esq.
        Anthony F. Cardoso, Esq.

**Lewis Silverman, Esq.**
Attorney for Defendants Brentwood Union Free School District and Brentwood Board of
Education
369 Lexington Avenue, 8th Floor
New York, New York 10017

**HURLEY, Senior District Judge:**

Plaintiff brings this action against her former employer, the Brentwood Union Free School District (the "District"), the Brentwood Board of Education (the "Board") (collectively, the "Brentwood defendants"), and three Board members.[1] The Court previously dismissed several claims in this action, but allowed plaintiff to proceed on (1) her intimate association claim under the First Amendment against the District, the Board, Gale Kirkham ("Kirkham"), Tomas Del Rio ("Del Rio"), and Joseph Fritz ("Fritz")[2] only, (2) her claim under the Equal Protection Clause of the Fourteenth Amendment against Kirkham only, and (3) her state law claims.[3] *Talley v. Brentwood Union Free School District*, 2009 U.S. Dist. LEXIS 53537 (E.D.N.Y. June 24, 2009). The Brentwood defendants and the individual defendants now move under two separate motions for summary judgment as to all of the remaining claims. For the reasons that follow, defendants' motions are granted in part and denied in part.

## BACKGROUND

This action arises from the decision of three members of the Brentwood Board of Education to abstain from a vote on whether to hire plaintiff for a teaching position within the Brentwood School District. Plaintiff alleges that these three individuals, namely Kirkham, Del Rio, and Fritz, abstained from the vote, thereby denying plaintiff the teaching position, because they harbored enmity towards plaintiff's father, George M. Talley, a fellow member of the Board

---

[1] Plaintiff also asserts claims against Residents for Better Schools of Brentwood and North Bay Shore, New York, Inc., and has obtained a certificate of default against this defendant from the Clerk of Court. (*See* docket no. 39.) However, no subsequent motion for default judgment against this defendant was ever filed, notwithstanding that the Court set March 2, 2009 as the deadline to file such a motion. (*See* Order dated 2/17/09.) Plaintiff shall show good cause in writing within three weeks of the entry of this Memorandum and Order why the claims against this defendant should not be dismissed pursuant to Fed. R. Civ. P. 41(b) for failure to prosecute.

[2] These three individuals will be referred to hereinafter as the "individual defendants."

[3] Plaintiff has withdrawn her claim pursuant to New York Civil Rights Law section 51. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motions at 3; Plaintiff's Affidavit ¶ 3.)

and, at the time of the vote the President of the Board, in violation of plaintiff's First Amendment right to intimate association. Plaintiff further claims that Kirkham's decision to abstain was also motivated by the fact that plaintiff is white, in violation of the Equal Protection Clause of the Fourteenth Amendment.

## I. Plaintiff's Employment with the District Before and During the 2006/2007 School Year

The relevant events begin with plaintiff's employment with the District as a teacher's assistant and sign language interpreter. (Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1") ¶ 29.)[4] It is not clear from the record how far back she held these positions, but it is not disputed that these jobs are distinguishable from a classroom teacher position, and that they did not require a teaching certificate. (*See* Defs.' 56.1 ¶¶ 29-32.)

In June of 2006, the District offered plaintiff a contract for a "leave replacement teaching position" for the 2006/2007 school year, with the contract period ending on June 30, 2007. (Defs.' 56.1 ¶ 30.) The letter extending the offer stated that it was conditioned on proof that plaintiff held a valid New York State Teaching Certificate. (*Id.* ¶ 32.) The letter contained two boxes for plaintiff to check: one affirming that she held the requisite certificate, and one declining to accept the offer. (*Id.* ¶ 35.) Plaintiff signed the letter without checking either box and returned it to the District. (*Id.* ¶ 36.) Roughly a week after receiving the job offer, plaintiff completed a formal application for the position of "leave replacement special education teacher," which asks whether the applicant has a valid New York State Teacher's Certificate. (*Id.* ¶ 40-41.)

---

[4] Although the District and Board defendants are represented by different counsel from the individual defendants, and although these two defendants have moved separately for summary judgment, they have submitted a joint statement of facts. Unless otherwise noted, these facts are undisputed by plaintiff.

For those who do, the form offers two boxes of which only one can be selected: "Professional" and "Initial." (*Id.* ¶ 42.) Plaintiff selected "Initial."[5] (*Id.* ¶ 43.)

During the time plaintiff signed and returned the offer letter, and completed the application form, she did not possess a valid teacher's certificate. (*Id.* ¶¶ 37, 44; *see* Pl.'s Teacher Certificate, Defs.' Ex. AA ("Effective Date: 09/01/2007").) Plaintiff disputes this fact by suggesting that she held a "'pending' certification and was permitted to teach pending obtainment of the complete certification." (Plaintiff's Rule 56.1 Counterstatement of Material Facts ("Pl.'s 56.1") ¶ 44; *see also id.* ¶ 37.) In her deposition, she stated that she was entitled "according to state law" to teach while her certificates were "pending." (Pl.'s Dep. 28.) Defendants, however, proffer evidence that the New York State Education Department, the state agency responsible for issuing teaching certificates, has never had a classification for a "pending certificate." (Defs.' 56.1 ¶ 172 (citing Marriot Aff. ¶¶ 10-11, Defs.' Ex. L).) At the time plaintiff submitted these documents to the District, she had only passed two of the three tests required to obtain her teacher's certificate. (*See* Defs.' 56.1 ¶ 70.)

Before plaintiff, or any other teacher, can begin service as a non-substitute classroom teacher in the District, the Superintendent must recommend a particular candidate to the Board for its approval. At the August 21, 2006 Board meeting, Interim Superintendent Michael Cohen ("Cohen") recommended that plaintiff be approved by the Board for the temporary replacement teaching position mentioned above, with service from September 1, 2006 to June 30, 2007. (*Id.* ¶ 59.) The accompanying "Human Resources Report" to the Board indicated that plaintiff was

---

[5] Plaintiff, however, notes that she did disclose elsewhere in the application the dates that she was scheduled to take her remaining certification exams. (Pl.'s 56.1 ¶ 413.)

certified to teach.[6] (*Id.* ¶ 58.)  Plaintiff's employment was approved unanimously by the Board at that meeting. (*Id.* ¶ 61.)

At some point after he began his tenure as the Interim Superintendent in June 2006, Cohen discovered that certain District employees had been hired and/or transferred without the knowledge of the District's Director of Human Resources. (*Id.* ¶ 78.)[7]  As a result, Cohen ordered an audit to determine the certification status of every District employee. (*Id.* ¶ 81.)  In or about May 2007, Cohen became aware that plaintiff was among the teachers who were not properly certified. (*Id.* ¶¶ 86-87.)  Cohen advised the Board of this fact during a closed executive session, and informed them that because plaintiff's lack of certification was discovered so late in the school year, and after talking to County education officials about the matter, he was inclined to allow her to remain in the classroom through the end of June – the termination date for her contract. (*See Id.* ¶¶ 97-99, 104; *see also* Cohen Dep. 30-32.)

When the Board met again for an executive session in late June 2007, plaintiff had still not passed all of her required examinations and had not obtained her certification. (*Id.* ¶¶ 107-08.)  Although plaintiff's only contract with the District at that time was to end on June 31, 2007, her father, George Talley, asked during the meeting that she be allowed to continue receiving health benefits. (*Id.* ¶ 108-109.) The District's general counsel responded that this would entail an illegal gift of public funds.  According to Cohen's testimony, George Talley asked at the meeting if a teaching position could be held open for plaintiff until she got the results of her last certification test, which she took in the beginning of June 2007. (*Id.* ¶ 111.)  George Talley,

---

[6] Plaintiff disputes that the Board ever saw this document. (Pl.'s 56.1 ¶ 58.)

[7] As with a number of defendants' factual statements, plaintiff disputes the truth of this statement, and argues that it constitutes hearsay.  No explanation is given as to why the statement is purportedly untrue, or why she believes it is hearsay, and the Court will not credit such bald, unsupported assertions.  Therefore, this factual statement, as well as other factual statements lacking a sufficient response from plaintiff is deemed admitted for present purposes. *See Guru Kripa Foods, Inc. v. Inter, Inc.*, 2012 U.S. Dist. LEXIS 113187 at *7 (E.D.N.Y. Aug. 10, 2012); *see also* Local Civil Rule 56.1(d).

however, disputes that he made this request, or that he talked to anyone in the District about rehiring plaintiff. (G. Talley Dep. 91.)

## II.    Intra-Board Relations

According to Kirkham's deposition testimony, a clear division of allegiances existed between the members of the Board, with George Talley, Suzanne Bellinger, Stephen Coleman, and Lorraine Pace on one side, and the individual defendants and Helen Moss on the other. (Kirkham Dep. 117.)  This division led to open verbal sparring at public board meetings. (*See generally*, Transcript of October 18, 2007 Board Meeting, Defs.' Ex. II.)  Kirkham has referred to George Talley as a "plantation owner," (Kirkham Dep. 30-32), while Fritz referred to him as "King George." (Fritz Dep. 119-20.)  Del Rio likened his personal relationship with George Talley to "an allergic reaction." (Del Rio Dep. 94-95.)  At a public Board meeting, George Talley allegedly called Del Rio a "cockroach" and a "spic," prompting Del Rio to respond on the record that George Talley was a racist. (*Id.*) According to Coleman's testimony, Del Rio approached other Board members to accept nominations for Board President in an effort to block George Talley's candidacy for the presidency.  (Coleman Dep. 26-28, Pl.'s Ex. B.)  During a Board meeting on October 18, 2007, which is discussed in more depth below, Fritz took issue with George Talley's decision to vote against a contract to hire Jerry Kramer as a lobbyist for the District, and exclaimed to George Talley, "what comes around goes around." (Fritz Dep. 124-25.)

### III.     Tanya Moss is Hired

On June 27, 2007 Cohen recommended that the Board approve Tanya Moss, the daughter of Board member Helen Moss, for a teaching position with the District. (Defs.' 56.1 ¶¶ 113-15.) Her employment was approved by five votes of the Board.[8] (*Id.* ¶¶ 117-18.) George Talley abstained purportedly out of concern that she had not paid her dues by serving as a substitute teacher in the District before being hired, although he also stated that the recommendation for Tanya Moss's candidacy appeared to be a "consolation prize for [her] mommy losing the election." (G. Talley Dep. 42-43.)  George Talley's abstention upset Del Rio, who confronted George Talley at the end of the June 27, 2007 meeting and told him that "nobody else is going to get a super majority vote in the district." (Del Rio Dep. 87; *see also* footnote 8.)

Plaintiff alleges that the position was specifically created for Tanya Moss by the individual defendants, and that the position was not, but should have been, posted internally to allow existing District teachers to apply. (Defs.' 56.1 ¶¶ 130-32.)

### IV.     Plaintiff's Candidacy for the 2007/2008 School Year

On or about August 27, 2007, plaintiff learned that she had passed the last test needed to obtain her teacher's certificate. (*Id.* ¶ 138.) She later received her official certification from the State of New York, effective September 1, 2007, in the areas of Childhood Education (Grades 1-6) and Students with Disabilities (Grades 1-6). (*Id.* ¶¶ 164-65; Pl.'s Teacher's Certificate, Defs.' Ex. AA.)  On August 27, 2007, Victoria Regan ("Regan"), Director of Special Education, recommended that plaintiff appointed to a "CFE" probationary teaching position at the District's Southwest Elementary School to begin in September 2007. (*Id.* ¶ 154.)   Defendants

---

[8] Because Tanya Moss was related to a member of the Board, she had to obtain a supermajority of the votes in order for her to be hired. *See* N.Y. Educ. L. § 3016(2).

assert that "certain District officials had been holding [this] teaching position open for plaintiff," (Defs.' 56.1 ¶ 144), but plaintiff argues that Regan was the only one openly advocating for her candidacy, as Regan believed plaintiff was the best candidate, and because plaintiff had previously taught the same class, (Pl.'s 56.1 ¶ 144). The parties also dispute whether it was typical to have a fall teaching position still open at the end of August. (Compare Defs.' 56.1 ¶ 142-43 with plaintiff's corresponding response.)

In September 2007, the District's new Superintendent, Donna Jones ("Jones"), recommended plaintiff to the Board for the job – a probationary tenure-track position. (*Id.* ¶¶ 184, 192.) In her deposition testimony, Jones cites a number of reasons for making this recommendation, including that plaintiff was a good "fit" for the position, (Jones Dep. I 32),[9] that she had previously worked in the District schools, that she was certified, that she lived in the district, and because Jones felt pressure from George Talley who, at that time, was the President of the Board, (Jones Dep. II 13-14).

Plaintiff's position came up for a vote before the Board on September 20, 2007, but she only received four votes in her favor – short of the supermajority she needed as the daughter of a Board member. (Defs.' 56.1 ¶¶ 187, 207; *see also* footnote 8.) The individual defendants all abstained from the vote.

The District continued to pay plaintiff after this point as a substitute teacher. (*Id.* ¶ 208.) When the individuals learned of this fact through the Superintendent's monthly report, they prepared a letter to Jones dated September 27, 2007, requesting information so they could "better understand the current status of [plaintiff's] employment." (Jones Letter, Defs.' Ex. EE.) Most of the ten items listed in the letter pertained to the individual defendants' concerns that a position

---

[9] Jones's deposition was taken over the course of two days. The transcript from the first day is referred to herein as Jones Dep. I, and the second day as Jones Dep. II. These transcripts are attached to defendants' motion as exhibits U and Q respectively.

had been improperly held open for plaintiff, and that proper procedures were not followed leading up to the September 2007 recommendation to the Board that plaintiff be hired. (Defs.' 56.1 ¶¶ 196-205.) Specifically, the defendants point to the following policies and rules that they felt may not have been followed. Under District Policy 4100, the Superintendent, through the District's human resources office, must "make a reasonable effort to interview the top ten percent of the most qualified applicants" who apply for a particular position. (*See* Defs.' 56.1 ¶ 159.) The same policy requires that in order to "further attract a wide range of talented and diverse candidates for professional positions (teachers and administrators), the District will, when necessary, place job announcements in local newspapers, the District newsletter, and make use of electronic media." Further, all open positions "should be posted on the District's website." (Defs.' 56.1 ¶ 160.)

The individual defendants' September 27, 2007 letter therefore demanded, among other things, a copy of any postings or advertisements for the special education teacher position for which plaintiff was hired, a list of the names of those who interviewed for the position, the resumes from all those who applied for the position, a copy of any termination letter sent to plaintiff following the Board's September 20, 2007 decision not to hire her, a copy of the advertisement to fill the position after this decision, and proof that plaintiff's position was one of the "70 positions approved [by the Board] under CFE."[10] (Letter to Jones, Defs.' Ex. EE.)

The District's human resources office responded that the position was not posted or advertised, which, the office noted, is only necessary where "there is a lack of bona fide

---

[10] "CFE" stands for "Contract for Excellence," which defendants describe as an agreement between the District and the State Education Department wherein the State provides funding to "close the gap between high achieving school districts and low achieving ones." (Defs.' ¶¶ 155-56.) Defendants also contend that when CFE money was provided, "the district used the money to create specific earmarked positions in its annual budget." (*Id*. ¶ 157.)

candidates."[11] (HR Response Letter, Defs.' Ex. FF; Pl.'s 56.1 ¶ 343.)  No other candidates were interviewed for the position. (HR Response Letter.)  The District also did not issue plaintiff a termination letter, because the Board's vote only affected her candidacy for the probationary tenure track position, not her official status at that time as a substitute teacher. (*Id.*)  Further, the District did not post or advertise for the position once plaintiff's vote failed. (*Id.*) As to the CFE issue, according the human resources office, plaintiff's position was never designated as a CFE-funded position.  Rather, the employee who previously held the position that plaintiff was slated for, transferred to "IMC" to fill one of the designated CFE position at that location. Plaintiff was recommended to take this individual's place in a non-CFE position at the District's Southwest Elementary School. (*Id.*)

At the October 18, 2007 Board meeting, George Talley moved for a revote on plaintiff's candidacy for the position. (Defs.' 56.1 ¶ 240.)  Before the Board members cast their vote, Kirkham stated the following on the record:

> We were at a conference on Saturday, Educating Minority Children, and this was a very interesting statistic that [was] brought – that [was] brought up.  Out of five minority school districts, which Brentwood is one, they – those five districts educate an average of 86.42 percent of minority students in grades – grades pre-K through 12.  Suffolk County's average is 26.8.  But on the other hand, those same five districts only employ and average of 22.4 percent minority teachers.
>
> Now, I know minority teachers that have tried to get into this District. I know white teachers that have tried to get into this District. And when you start correcting it, then I'll vote for it.
>
> Right now I am not voting for it, because you know what, call a spade a spade or whatever, but right is right, and until you prove to me that you're going to accept other people, other nationalities.  I hear that this year it was Tanya Moss in the elementary school and another teacher at the secondary level. Only two black teachers were hired in this District this summer, and that

---

[11] Plaintiff also notes that District Policy 4100 mandates "soliciting candidates from within the Brentwood School System whenever practicable. Applications from outside the District shall not be considered until after an initial screening of applications from within the District." (Pl.'s 56.1 ¶ 160 (quoting District Policy 4100).)

is ridiculous. I don't care if you don't agree with me, but that's ridiculous.

(Transcript of October 18, 2007 Board Meeting ("Tr.") at 54-55, Defs.' Ex. II.)

The Board then voted, with all three individual defendants again abstaining, effectively depriving plaintiff of the super majority that she needed, and denying her the position. (*Id.* ¶ 243.) Shortly after this vote, but while the meeting was still in session, plaintiff, who was in the audience, took the public podium to address the Board. ((*Id.* ¶ 252.) The following dialogue ensued.

> Plaintiff: Can you please explain to me, with my credentials, my years working in this District, why I am not qualified, and why you abstain against me?
>
> Del Rio: I'm going to – I don't have anything personal against you, like Mr. Talley didn't have anything personal against Tanya Moss.
>
> Plaintiff: He [George Talley] didn't.
>
> Del Rio: But he voted against her. And the fact remains that if that position was terminated June 30th, what happened to all the teachers that were licensed that were waiting to get that position?
>
> Plaintiff: I had a pending certification, which everybody gets before they have their initial certification. I have every right to be in that classroom. The State knows it. Michael Cohen was corrected. . . So what is your true reason? . . . That's not good enough for me and I don't accept that. . . .
>
> Del Rio: Well, that's –
>
> Plaintiff: What is your real reason?
>
> Del Rio: Maybe you – Maybe you should ask your father – why did he vote against Tanya Moss?
>
> Plaintiff: It has nothing to do with my father.

11

> Del Rio:  Oh, it does.

(Tr. at 61-62.)

During this same meeting, Fritz offered George Talley a deal, "un-table" the vote on Jerry Kramer's contract (mentioned above), and he would vote for plaintiff's candidacy. (Fritz Dep. 124-25.)  George Talley declined this offer.  Later in the meeting, plaintiff again took the podium and entered into the following dialogue with Kirkham.

> Plaintiff: Would you say I am [highly qualified]?
>
> Kirkham: You say you are, so I have to take you at your word.
>
> Plaintiff: Oh, I know I am.
>
> Kirkham: I have to take you at your word.
>
> Plaintiff:  So, why would you abstain?
>
> Kirkham: That is personal. That is very personal.
>
> Plaintiff:  It's very personal?
>
> Kirkham: Yes, it's very personal.

(Tr. at 208-09.)

Kirkham and Fritz both suspected that George Talley had some involvement in creating a special position for plaintiff. (Kirkham Dep. 147; Fritz Dep. 79-82.) Del Rio was convinced that the position was created as an accommodation to George Talley. (Del Rio Dep. 91.)  In a follow-up email to Board counsel, Del Rio stated the following: "The reason why I abstained from voting on Mr. Talley's daughter's appointment on September 20 is because Mr. Talley had a position created to give his daughter employment in the District.  I consider her appointment nothing more than nepotism and a waste of taxpayers' dollars." (Del Rio Dep. 166.)

**DISCUSSION**

I. **STANDARD OF REVIEW**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and "after drawing all inferences and resolving all ambiguities in favor of the non-movant," that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion, *see Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).

## II. FIRST AMENDMENT INTIMATE ASSOCIATION CLAIMS

Plaintiff alleges that the individual defendants' decision to abstain from voting on her candidacy for employment with the District was substantially motivated by the fact that George Talley was her father, in violation of her right to intimate association under the First Amendment.

"The Supreme Court has recognized two types of associational rights: an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct." *Econ. Opportunity Comm'n of Nassau Cnty., Inc. v. County of Nassau*, 106 F. Supp. 2d 433, 439 (E.D.N.Y. 2000) (citing *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999)). "The right to intimate association protects the close ties between individuals from inappropriate interference by the power of the state." *Chi Iota Colony of Alpha Epsilon Phi Fraternity v. C.U.N.Y.*, 502 F.3d 136, 143 (2d Cir. 2007) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)).

"Constitutional protection for associational interests are at their apogee when close family relationships are at issue." *Patel v. Searles*, 305 F.3d 130, 137 (2d Cir. 2002) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984)). In relation to the specific facts of this case, the "parent/child relationship[ is] . . . among the most intimate . . . [and] warrant[s] the highest level of constitutional protection." *Patel*, 305 F.3d at 136; *see also Sutton v. Village of Valley Stream*, 96 F. Supp.2d 189, 192-93 (E.D.N.Y. 2000) (finding the father/son relationship to be a sufficiently intimate association to warrant First Amendment protection). In *Adler*, the Second Circuit held that First Amendment intimate associational protections applied to an

employee who was terminated from his job with the State of New York in retaliation for a lawsuit his wife brought against the State. 185 F.3d 35.

Where defendants act with mixed motives, *i.e.* they terminate an employee both for legitimate reasons and in retaliation for the activities of a sufficiently close family member, defendants carry the burden to demonstrate that absent the prohibited rationale, they would have taken the same action because of an available permissible motive. *See Talley*, 2009 U.S. Dist. LEXIS 53537 at *16 - *17 (citing *Adler*, 185 F.3d at 46-47).

Here, defendants do not dispute that plaintiff was terminated, or that plaintiff's relationship with her father constitutes an intimate association subject to protection under the First Amendment. Defendants do dispute, however, that their decision to abstain from the subject vote was motivated by plaintiff's relationship to her father. (Memorandum of Law in Support of the Individual Defendants' Motion for Summary Judgment ("Ind. Defs.' Br.") at 3. ) Defendants also argue that plaintiff must show "some impairment or impact on the intimate association to be actionable," and insist that plaintiff has not made such a showing. (*Id.* at 11.) The Court addresses each of these arguments below.

### a. Genuine Disputes of Material Fact Exist as to Whether Defendants Were Motivated by Plaintiff's Relationship to her Father

Defendants assert that their abstention from the vote was due to "substantial concerns as to plaintiff's certification status, the misrepresentation plaintiff made regarding that status, and whether District officials had complied with District hiring policy." (*Id.* at 3.)

As an initial matter, there is no genuine dispute that plaintiff was fully certified before she began teaching in the 2007/2008 school year, or that she was fully certified before the Board initially voted on her candidacy in September 2007. Further, the record does not precisely

indicate whether the individual defendants chose not to vote in plaintiff's favor out of concern that she was not actually certified at that time. Although defendants cite to evidence that they questioned at some point whether she had the proper certification (*see* Defs.' 56.1 ¶ 193), and that they requested proof of her certification (*see id.* ¶ 195), it appears that both occurred during the Board's executive session held prior to the September 20, 2007 meeting, (*see id.* ¶¶ 191-95; Jones Dep. II 9-11). Although Del Rio testified at that he did not see written proof of plaintiff's teacher's certificate until the following January, 2008, (Del Rio Dep. 54-55) there does not appear to be evidence that defendants suspected plaintiff was not in fact certified when her candidacy went to a vote in late September.

Nevertheless, defendants aver that one of the reasons for not approving plaintiff for the job was that she misrepresented her certification status to the District at least in part through the offer letter and application mentioned above. The parties do not dispute that defendants were fully aware that Cohen discovered late in the 2006/2007 year that plaintiff had been teaching for nearly ten months without a certificate, or that defendants were aware that she had still not passed all of her exams at the beginning of the 2007 summer vacation. (Defs.' 56.1 ¶ 92.) However, it is not clear from the record whether the individual defendants had seen the documents in which plaintiff purportedly made these misrepresentations before they voted.[12] The argument could nevertheless be made that even if the individual defendants had not seen these documents, they could have inferred that she was not entirely forthcoming with the full truth. Certainly, if plaintiff knew that she still needed to pass certain examinations, then a fair inference can be draw that she was aware that her certification was not complete and accepted the position anyway.

---

[12] For present purposes, it is not necessary for the Court to resolve whether, as plaintiff suggests, she held some form of "pending" certification that entitled her to remain in her classroom teaching position until the end of her contract on June 30, 2007.

However, the only evidence identified by defendants that such an inference was actually drawn relates to Fritz, not the other individual defendants. Fritz affirmatively testified that plaintiff's lack of candor regarding her certification affected the way he voted on her candidacy. (Defs.' 56.1 ¶¶ 204-05.) Plaintiff, of course, offers evidence that Fritz's decision was motivated by retaliation for the acts of George Talley, *viz.* Fritz was angered by the fact that he had not voted on Jerry Kramer's contract, and told George Talley "what goes around comes around." (Pl.'s 56.1 ¶ 393.) As discussed above, where there is evidence of mixed motives in this context, the burden falls on defendants to show that the same challenged action would have been taken because of the permissible motive. This issue was essentially put to the test at the October 18, 2007 Board meeting when Fritz offered to vote in plaintiff's favor if George Talley "un-tabled" the Jerry Kramer vote. (Pl.'s 56.1 ¶ 394.) Fritz's actions here show that under the right circumstances, which notably had nothing to do with plaintiff, he would have voted for her to fill the position despite her perceived lack of candor. Genuine issues of fact therefore remain as to whether Fritz and the other individual defendants were actually motivated by plaintiff's purported misrepresentations to the District regarding her certification.

As to defendants' argument that they were motivated by the District's failure to follow its own hiring procedures when recommending plaintiff for the position, triable issues of fact remain here as well. Although defendants clearly demonstrated an effort to uncover whether the District had followed such procedures, plaintiff has proffered evidence that these activities themselves may have been motivated by, and served as pretext for, impermissible considerations. Specifically, the individual defendants apparently did not express this same level of concern for procedure when other candidates came before the Board for approval. For instance, no inquiry was made into the District's hiring practices when the Superintendent recommended Marisa

Tamburro, who is not related to a Board member, or Tanya Moss, who is related to a Board member with whom the individual defendants are purportedly aligned. (Pl.'s Opp. at 13 (citing Del Rio Dep. 66, 147; Kirkham Dep. 21-24; Fritz Dep. 87-88).)

Of course, defendants argue that their inquiry was prompted by reason to believe that either District officials had held this position open as a favor to George Talley, or that George Talley took it upon himself to see that the position was held open. Nevertheless, although anti-nepotism rules have been upheld in the face of challenges claiming they unduly burden the right of intimate association, *see, e.g., Montgomery v. Carr*, 101 F.3d 1117 (6th Cir. 1996), genuine issues of fact remain disputed as to whether defendants had good cause to believe that George Talley caused or attempted to cause a position to be held open for plaintiff.

In reaching this conclusion, the Court has also considered defendants' argument that "prior to the discovery of plaintiff's lack of certification and misrepresentation, the Individual Defendants unanimously voted in favor of hiring plaintiff just a year earlier." (Pl.'s Br. at 13.) While this is certainly true, much of the evidence of hostility between the individual defendant and George Talley pertains to events occurring after this first vote. Most prominent among these events is Del Rio's struggles with George Talley as he ascended to President of the Board in 2007, and George Talley's decision not to vote for Tanya Moss in June 2007.

Furthermore, a reasonable jury could conclude that in conjunction with the animosity that existed between the individual defendants and George Talley, the utterances of the individual defendants on the record at the October 18, 2007 Board meeting evince a motivation to deny plaintiff employment based solely on her relationship to her father. As fully excerpted above, Del Rio told plaintiff at a public meeting that the real reason for his vote had to do with

plaintiff's father. Kirkham stated that her decision was "personal," and Fritz told George Talley that "what goes around comes around."

Therefore, defendants have failed to demonstrate that there is no genuine issue of triable fact as to whether they denied plaintiff employment in retaliation for the acts of her father.

### b. Plaintiff is Not Required to Demonstrate a Particular Level of Injury to the Relationship

Defendants further urge that in order for plaintiff to prevail on her First Amendment claim, she must "show some impairment or impact on the intimate association." (Defs.' Br. at 11.) Courts have employed a number of standards to determine whether certain conduct has infringed on one's right to intimate association. Among these standards are whether "the challenged action has the likely effect of ending the protected relationship," *Adler*, 185 F.3d at 43, whether "affecting the relationship was the purpose of the challenged regulation," *id.*, and whether the action was "arbitrary or an 'undue intrusion' by the state into the [ ] relationship," *id.* (citing *Adkins v. Board of Educ.*, 982 F.2d 952, 956 (6th Cir. 1993)).

In support of their position, defendants cite to *Sacay v. Research Foundation of the City Univ. of New York*, 193 F.Supp. 2d 611 (E.D.N.Y. 2002), in which plaintiff "failed to present any evidence that her transfer and demotion burdened her relationship with her mother." *Id.* at 635. However, *Sacay* is distinguishable from the instant case in that it addressed the applicable standard in the context of qualified immunity. Although *Sacay* was decided after *Adler*, the conduct at issue occurred before. The *Sacay* court therefore determined that the defendants were entitled to qualified immunity because the "undue intrusion" standard recognized in *Adler* did not exist when the challenged action occurred. It was, in the court's opinion, objectively reasonable for the defendant to believe that their conduct would not have the "likely effect of

ending the protected relationship" as one of the prior standard required. *Id.* *Sacay* therefore analyzed the present cause of action under pre-*Adler* standards.

Presumably aware of this issue, defendants here suggest in their brief that the *Sacay* court's requirement that plaintiff show an actual burden on the relationship, "is in line" with the "undue intrusion" standard in *Adler.* (Ind. Defs.' Br. at 11.)  The Court does not agree.  In *Adler*, the Second Circuit held that "retaliatory discharge based solely on litigation instituted by one's spouse is actionable under the First Amendment," 185 F.3d at 45, without articulating a requirement that the plaintiff demonstrate an injury to the relationship.  Defendants' further suggest that in *Patel*, 305 F.3d at 137, the Circuit "clarified [] that some level of interference with the relationship is required, despite declining to specify how much." (Ind. Defs.' Br. at 12.) To the extent that *Patel* even stands for such a proposition, and it is not entirely clear that it does,[13] the Circuit explicitly stated in *Patel* that "less severe burdens" than were present in that case have been held to implicate the right to intimate association. *Patel*, 305 F.3d at 137.  The Circuit's example of such lesser burden was *Adler*, which involves substantially similar conduct to the present case, *viz.* that the plaintiff was allegedly terminated in retaliation for the acts of a close family member. *Id.*  As Second Circuit precedent does not appear to require the plaintiff to articulate a specific level of injury to the intimate relationship at issue, the Court declines to require such a showing here.[14]

---

[13] *See, e.g. Miron v. Town of Stratford*, 2012 U.S. Dist. LEXIS 102703 at *25 (July 24, 2012)(Patel "emphatically rejected an assertion that a purported intrusion or violation of the right to intimate association must meet a threshold level of severity in order to trigger constitutional protection.")

[14] It is perhaps worthy to note that plaintiff asserts in her affidavit that the alleged conduct "continually causes friction and arguments between [her and her father]." (Pl.'s Aff. ¶ 49.)  Although this single statement is hardly an overwhelming demonstration of the impact on her relationship, for the reasons stated above, the Court need not evaluate the sufficiency of this evidence.

In sum, defendants have failed to show the absence of genuine issues of trial fact pertaining to plaintiff's First Amendment claim. Summary judgment on that claim is therefore denied.

### III.    FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIMS

Plaintiff next alleges that defendant Kirkham, who is African American, also voted against her candidacy for a position within the District due to the fact that plaintiff is white.

The Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from "invidious discrimination in statutory classifications and other governmental activity." *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297, 322, (1980)). "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005) (citations omitted), *overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008); *accord Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). A plaintiff alleging a violation of her Equal Protection rights must demonstrate that she was treated differently "than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citation omitted). *But cf. Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001) ("[A] plaintiff who . . . alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.").

Equal protection claims pertaining to workplace discrimination utilize the same burden-shifting framework as Title VII claims. *See Feingold v. New York*, 366 F.3d 138, 159 (2d Cir.

2004). Under this framework, (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the presumptions and burdens of this framework disappears, leaving the sole remaining issue of "discrimination *vel non*," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

To make out her *prima facie* case, plaintiff must show that she: (1) belongs to a protected class; (2) was qualified for the position she sought; (3) suffered an adverse employment action; and (4) did so under circumstances giving rise to an inference of discrimination. *Terry v, Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003); *see also Feingold*, 366 F.3d at 159) ("Once action under color of state law is established,[15] . . . [t]he elements of [Title VII claims] are generally the same as the elements of [workplace discrimination claims under the Equal Protection Clause] and the two must stand or fall together.")

As with plaintiff's First Amendment claim, defendants dispute only that plaintiff has made out the final element of her Equal Protection claim, *i.e.* that Kirkham was motivated by discriminatory animus in deciding not to vote in favor of plaintiff. Here, Kirkam argues that plaintiff's only evidence of discrimination arises from what she describes as "an isolated remark during the October 18, 2007 Board meeting that the District needed to consider hiring more minority teachers." (Ind. Def.'s Br. at 16.) Given the content and timing of this remark in

---

[15] There is no dispute that defendants here are state actors.

conjunction with the vote on plaintiff's employment (see further discussion *infra*), the Court finds that plaintiff has met her "minimal" burden at the *prima facie* stage. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001).

Turning to the second stage of the burden-shifting framework, Kirkham offers the same legitimate, non-discriminatory rationale for her actions that the individual defendants offered in the context of the First Amendment claim. See discussion *supra* at subsection III a.

Moving to the third and final stage of analysis, plaintiff has set forth sufficient evidence to permit a reasonable jury to find that Kirkham's proffered rationale is pretext for discrimination. First, although Kirkham characterizes her remarks during the subject Board meeting as a "generic statement about hiring more teachers of color," in actuality, they have a far more direct connection to plaintiff's candidacy than Kirkham suggests. Her statement, which was made in public and on the record, begins with a general recitation of the statistical disparity between the percentage of minority students and the percentage of minority teachers in the District. Following this broad framing of the issue, however, she adds that "when you start correcting it, then I'll vote for it." (Tr. at 54-55.) Taken in context, a reasonable reading of that statement is that until the Board/District corrects this disparity, she will not vote for a non-minority. This utterance was made just as George Talley had moved for a revote on hiring a non-minority, white candidate: plaintiff. This reading is further supported by Kirkham's follow-up statement that "[r]ight now I am not voting for it, because you know what, call a spade a spade or whatever, but right is right, and until you prove to me that you're going to accept other people, other nationalities . . . ." (*Id.*) Certainly, a reasonable juror could conclude from this statement that Kirkam decided on plaintiff's candidacy—the only decision then before the Board

23

when she made the statement—based on the fact that plaintiff was white. Material issues of fact therefore exist to preclude summary judgment on plaintiff's Equal Protection claim.

The Court is not swayed by Kirkham's argument that discriminatory inference should not be drawn from her statements because she earlier voted *in favor* of hiring plaintiff for the 2006/2007 school year. (Ind. Defs.' Br. at 16.) However, as defendants themselves quote in their brief, the "underlying rationale for [this] [same-actor] inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class." *Figueroa v. N.Y. City Health & Hosps. Corp.*, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007)(citation omitted). In this case, there is evidence that would permit a trier of fact to conclude that Kirkham did suddenly develop such an aversion. Kirkham opened her statement at the meeting by noting that she had had just attended a conference that past weekend entitled "Educating Minority Children." (Tr. at 54.) It was at that conference that she first learned the statistics regarding minority students and minority teachers in the District. (*Id.*) Indeed, the very manner in which Kirkham framed her statement at the meeting suggests that she developed an aversion to hiring non-minority teachers during that conference, which of course occurred after she voted in favor of hiring plaintiff and before she voted against it.

Kirkham further argues that plaintiff, did not identify a similarly situated individual from outside her class that was treated more favorably than she was. (Ind. Def.'s Br. at 17.) However, just months before Kirkham voted against plaintiff, she lodged a vote in favor of Tanya Moss, whose mother was on the Board at the time of the vote on her candidacy for a teaching position, and who is African-American. In fact, Kirkham testified that she specifically voted in favor of Tanya Moss because she had two Master's Degrees and had passed all of the tests required for her teacher's certificate. (Kirkham Dep. at 21.) Plaintiff too possesses two Master's Degrees and

by the end of August 2007, had passed all of her certification exams. Defendants argue in their reply memorandum that these two individuals are not sufficiently comparable because there was no indication that a position had been "improperly created or held open for Tanya Moss," that District hiring policies had been ignored, that Tanya Moss had failed any of her certification exams, or that she had misrepresented her certification status to the District. While these differences do exist, as discussed above, triable issues of fact exist as to all of these asserted reasons for denying plaintiff employment. As such, a jury must also decide these facts in the context of whether these two individuals are similarly situated.

Finally, Kirkham notes that plaintiff was "replaced" by Marisa Tamburro, a member of the same class as plaintiff, suggesting that Kirkham could not therefore have acted with discriminatory animus. While it is true that the Board approved the recommendation to hire Marisa Tamburro at the October 2007 meeting, defendants do not point to any evidence that Kirkham herself voted in favor of Tamburro.

As genuine issues of triable fact remain as to plaintiff's claim against Kirkham, summary judgment thereon must be denied.


## V.  IMMUNITY

### a.  Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-

part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129 (2d Cir. 2010)(citation omitted).

The individual defendants first argue that there is no evidence to suggest that they violated plaintiff's constitutional rights, and that even if there is, the evidence would not implicate any rights that were clearly established in 2007. (Ind. Defs'. Br. at 33.)

Regarding plaintiff's intimate association claim, the Court previously stated in this case that "in light of *Adler*[, 185 F.3d 94], a reasonable person would understand that the right of intimate association is violated when there is a refusal to hire one family member solely in retaliation for another family member's exercise of his or her First Amendment rights." *Talley*, 728 F. Supp. 2d at 237. The Court further stated in that decision that the "existence of the qualified immunity defense may well depend on what facts plaintiff is able to establish." *Id.* at 238.

Here, as discussed above, genuine issues of material fact remain as to whether the individual defendants chose not to vote in favor of plaintiff based on her relationship to her father, and as to whether Kirkham abstained from the same vote based on plaintiff's race. The same issues of fact that preclude an award of summary judgment on these claims likewise preclude granting the individual defendants qualified immunity at this juncture. *See Cobb v. Pozzi*, 363 F.3d 89, 111-112 (2d Cir. 2003) ("The issue of rational treatment is not sufficiently different from the issue of whether the defendants acted in an 'objectively reasonable' manner so as to lead us to resolve the latter issue as a matter of law where we have concluded in the face of disputed issues of fact that the jury must resolve the former issue.")(citation omitted). The individual defendants are therefore not entitled to summary judgment under qualified immunity.

### b. Absolute Legislative Immunity

The individual defendants further argue that they are entitled to absolute legislative immunity by virtue of the fact that they voted in their capacity as members of the Board. Absolute legislative immunity extends to local legislators. *Carlos v. Santos*, 123 F.3d 61, 66 (2d Cir. 1997); *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1224 (2d Cir. 1994)(Town Board members). In *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998), the Supreme Court held that whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.*

Where a local school board takes action on employment decisions, such action is considered "administrative, not legislative, in nature" because a board in that circumstance "[does] not engage in the kind of broad, prospective policymaking that is characteristic of legislative action." *Harhay v. Town of Ellington Board of Education*, 323 F.3d 206, 210 (2d Cir. 2003). Such is precisely the action taken against plaintiff in the present case. The only decisions at issue here pertain solely to the Board's vote on the administrative matter of plaintiff's employment. The individual defendants are therefore not entitled to absolute legislative immunity.

## VI. STATE LAW CLAIMS

### a. Intentional Infliction of Emotional Distress

In order to assert a claim for intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show: "(1) extreme and outrageous conduct, measured by the reasonable bounds of decency tolerated by society; (2) intent to cause or disregard of a substantial probability of causing severe emotional distress; (3) a causal connection between the

conduct and the injury; and (4) severe emotional distress." *Margrabe v. Sexter & Warmflash, P.C.*, 353 Fed. Appx. 547, 550 (2d Cir. 2009) (Summary Order) (quoting *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001)) (internal quotation marks omitted). "Since the alleged conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, satisfying the outrageousness element is difficult, even at the pleadings stage." *Russo-Lubrano v. Brooklyn Fed. Savs. Bank*, 2007 U.S. Dist. LEXIS 2646 (E.D.N.Y. Jan. 12, 2007) (internal citations and quotation marks omitted). "Particularly in the employment context, New York courts are exceedingly wary of claims for intentional infliction of emotional distress . . . ." *Id.* (internal quotation marks omitted, alteration in the original).

Even if plaintiff were to establish the remaining disputed issues of fact in her favor, the challenged action at issue here is insufficient to meet the threshold for extreme and outrageous conduct necessary to sustain her IIED claim. *See Russo-Lubrano*, 2007 U.S. Dist. LEXIS 2646 at *7 (collecting cases). Summary judgment is therefore granted as to plaintiff's claim for intentional infliction of emotional distress.

### b. Defamation[16]

Under New York Law, in order to establish a defamation claim, a plaintiff must prove (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) by the defendant, 5) with injury to the plaintiff. *See Boyd v, Nationwide Mutual Ins. Co.*, 208 F.3d 406, 409 (2d Cir. 2000); *see also Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001). A

---

[16] Plaintiff sets forth claims in her Amended Complaint for "Willful Damage to Reputation and Good Name" (Am. Compl., "Eighth Claim") and for "Common Law Defamation" (Am. Compl., "Tenth Claim"). However, as defendants correctly point out, no separate cause of action exists under New York law for willful damage to reputation and good name, which relates to one's damages under a claim for defamation. (Ind. Defs.' Br. at 25 (citing *Epifani v. Johnson*, 65 A.D.3d 224, 234 (2d Dep't 2009).) Plaintiff does not dispute this assertion and concentrates solely on the defamation claim in her opposition papers. The Court therefore construes plaintiff's eight cause of action to have been withdrawn.

defamatory statement of fact is one that "tends to expose the plaintiff to public contempt, ridicule, aversion, or disgrace or induce an evil opinion of him in the minds of right-thinking people to deprive him of their friendly intercourse in society." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379, 366 N.E.2d 1299 (1977). "[I]f the language is not of such a nature, that is, if it merely constitutes a general reflection on a person's character or qualities, it is not a matter of such significance and importance as to amount to actionable defamation even though it may be unpleasant, annoying, or irksome, or may subject the plaintiff to jests or banter so as to affect his feelings." N.Y. Jur. Defam. § 5. Finally, "truth is an absolute, unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986), *cert denied*, 479 U.S. 1091 (1987) (internal quotation marks and citations omitted).

Plaintiff's defamation claims arise from a number of published statements. The first involves the content of a newsletter sent out to the Brentwood community by defendant Residents for a Better Neighborhood.[17] (Am. Compl. ¶¶ 70-73.) Although the pleading alleges that Fritz is an officer of this defendant organization, plaintiff fails to point to evidence in the record that this is true, or that he was otherwise involved in the creation or publication of this newsletter. Plaintiff has therefore failed to establish the fourth element of her claim as it pertains to the newsletter.

A second letter allegedly sent out by Fritz, states in relevant part "George Talley insisted in hiring his daughter, a person who did not pass have [sic] the required test at the time of the hiring." (Am. Compl. ¶ 74.) This statement is true. Although plaintiff had passed all of her exams when she was hired in September 2007 and before her candidacy came before the vote later that month, she had not passed all of her exams and she was not certified when she was hired in 2006. Her defamation claim as to this statement must therefore fail.

_____

[17] See footnote 1 for the status of claims against this defendant.

Finally, Del Rio allegedly told a newspaper that "although George Talley campaigned against nepotism and 'here he is creating [a] new position to get his daughter a job.'" (Pl.'s Opp. at 43.) Regardless of the truth of this statement, which is subject to disputed issues of fact identified above, it is reflective of George Talley, not plaintiff. To the extent that plaintiff suggests that a negative implication towards her is manifest in that statement, she does not identify what that implication is, nor is one apparent to the Court that would rise to the level of defamation. Therefore, this portion of her defamation claim must also fail.

Summary judgment as to plaintiff's claims for defamation against the individual defendants is granted.

### c. "Intentional Interference with Prospective Economic Relations"

Under New York law a plaintiff seeking to recover for tortious interference with business relations must allege "(1) there is a business relationship between plaintiff and a third party;[ ] (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair or improper means; and (4) the relationship is injured." Goldhirsh Group v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997).

Plaintiff bases this claim on the fact that when she sought employment in other school districts following the Board's denial of her application, "the interviewers knew details about what happened with [her] and the Brentwood District." (Pl.'s Aff. ¶ 32.) Plaintiff suggests in her opposition brief that "the interviewers could not have known of the details between plaintiff and Brentwood School District without having spoken to someone from within the District." (Pl.'s Opp. at 45.) Fatal to this claim is the fact that much of what transpired in this case occurred on the record at a public Board meeting and was reported in the local newspaper. If there are

"details" that prospective employers became aware of outside of what was available through these sources, plaintiff fails to articulate what they are, and the Court will not endeavor to guess. Defendants' motion for summary judgment as to plaintiff's tortious interference claim is therefore granted.

## VII.   BRENTWOOD DEFENDANTS

The defendant Board argues that the claims against it should be dismissed because "it is beyond dispute that there is no cause of action for damages under 42 U.S.C. § 1983 for damages against a school board or its members in their official capacities." (Pl.'s Opp. at 2-3 (quoting and citing *inter alia Seils v. Rochester City School District*, 192 F. Supp. 2d 100, 122 (W.D.N.Y. 2002).)   Although the *Seils* case and many of the cases to which it cites declare this proposition to be "beyond dispute," *Seils*, 192 F. Supp. 2d at 122, and/or "well established," *Mazza v. Hendrick Hudson Cent. Sch. Dist.*, 942 F. Supp. 187, 192 (S.D.N.Y. 1996), a review of its origins suggest that it is based on law overturned by the Supreme Court in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691(1978). See discussion in *Ruslander v. City of Buffalo*, 2003 U.S. Dist. LEXIS 25088 at *6 n.7 (W.D.N.Y. Aug. 22, 2003).   Furthermore, the board of education of each union free school district in New York is considered a separate corporate body and therefore generally a suable entity. *See* N.Y. Educ. Law § 1701.   Given these issues, the Court is not convinced by that the Board should escape liability simply by virtue of its status as a board of education for a union free school district.

Both of the Brentwood defendants also argue that plaintiff cannot establish *Monell* liability.   A municipality may not be held liable under Section 1983 on a respondeat superior theory of liability for its employees' alleged constitutional violations. *See Monell*, 436 U.S. 658;

*Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). A municipal entity may only be liable if the alleged conduct was undertaken pursuant to "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [its] officers" or a "governmental 'custom' even though such a custom has not received formal approval through [ ] official decisionmaking channels." *Monell*, 436 U.S. at 690-91. Accordingly, in order to bring a Section 1983 claim against a municipal defendant, a plaintiff must establish both a violation of his constitutional rights and that the violation was motivated by a municipal custom or policy. *Id.; see also Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686 (2d Cir. 2005) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

"For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under Monell." *Kantrowitz v. Uniondale Union Free School District*, 822 F.Supp.2d 196, 217 (E.D.N.Y. 2011) (quoting *Booker v. Board of Education, Baldwinsville Central School District*, 238 F.Supp.2d 469, 475 (N.D.N.Y. 2002)). Moreover, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1359 (2011).

Here, the challenged action was the result of a binding vote of the Board. *Monell* liability may therefore attach to the Brentwood defendants should plaintiff ultimately prevail on the merits of her claims. Although the Brentwood defendants argue that summary judgment should be granted on the merits of plaintiff's claims, as discussed above, genuine issues of triable fact remain as to plaintiff's federally based claims. The Brentwood defendant's motion for summary

judgment is therefore denied as to plaintiff's First Amendment and Equal Protection claims and granted as to plaintiff's state law claims for the reasons stated *supra*.


## CONCLUSION

For the reasons stated above, the defendants' motions for summary judgment are granted as to plaintiff's state law causes of action, but are denied as to plaintiff's federal constitutional claims.  This matter is respectfully referred back to the Honorable E. Thomas Boyle for final pretrial supervision.


SO ORDERED.


Dated: Central Islip, New York
       September 5, 2012                           _____/s_____
                                                   Denis R. Hurley
                                                   United States District Judge